**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TERRENCE R. YOAST,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO. 19-720** |
| **POTTSTOWN BOROUGH,** *et al.*, | |
| **Defendant.** | |

<u>**MEMORANDUM OPINION**</u>

**Rufe, J.**                                                                              **March 21, 2022**

Defendants Correctional Officer VanDorick, Correctional Officer Stein, and Montgomery County (together, the "County Defendants") and Defendants Primecare Medical, Inc. ("Primecare") and Anthony Hoch (together, the "Primecare Defendants") have moved for summary judgment on Plaintiff Terrence Yoast's remaining claims under 28 U.SC. § 1983 alleging violations of his rights under the Fourteenth Amendment and for intentional infliction of emotional distress under Pennsylvania law.[1] Plaintiff, proceeding *pro se*, opposes summary judgment with respect to Defendants Montgomery County and Primecare, and does not contest summary judgment with respect to Defendants VanDorick, Stein, and Hoch.[2] For the reasons stated below, Defendants' motions will be granted.

---

[1] County Defs.' Mot. Summ. J. [Doc. No. 133]; Primecare Defs.' Mot. Summ. J. [Doc. No. 131].

[2] Pl.'s Resp. County Defs.' Mot. Summ. J. [Doc. No. 140-2] ("Plaintiff does not oppose the request for summary judgment as to Defendants, Stein and VanDorick, and elects to confine his rebuttals to Defendant Montgomery County."); Pl.'s Resp. Primecare Defs.' Mot. Summ. J. [Doc. No. 139-2] at 1 n.1 ("Plaintiff does not contest Defendant Hoch's request for summary judgment and elects to confine his rebuttals to Defendant PrimeCare").

I.   **BACKGROUND**[3]

This case arises from Plaintiff Yoast's brief pretrial incarceration in the Montgomery County Correctional Facility (MCCF) between February 27 and February 28, 2017, and again between March 3 and March 11, 2017.[4] While detained, Plaintiff was not provided a continuous positive airway pressure ("CPAP") machine, even though he was diagnosed with sleep apnea in 2014 and regularly uses a CPAP machine to ameliorate his condition.[5] Defendants were involved with the operation of the MCCF and Plaintiff's medical treatment during his incarceration: Defendant Montgomery County operates the MCCF, Defendant Correctional Officers VanDorick and Stein are employed by Montgomery County at the MCCF,[6] Defendant Primecare is a corporation contracted to provide medical services to the MCCF, and Defendant Hoch is a "certified medical assistant" employed by Primecare at the MCCF.[7]

A.   **Plaintiff's First Incarceration (February 27 to February 28)**

Plaintiff, a landlord, was arrested and transported to the MCCF on February 27, 2017, following a series of altercations with one of his residential tenants.[8] When Plaintiff arrived at the MCCF, Defendant Hoch conducted a "receiving screening" of Plaintiff's medical condition.[9] At that screening, Plaintiff disclosed to Hoch that he was diagnosed with sleep apnea and

---

[3] The following facts are undisputed or viewed in the light most favorable to Plaintiff, the non-moving party.

[4] Pl.'s Resp. Primecare Defs.' Mot. Summ. J. Counter-Affidavit [Doc. No. 139-5] ¶¶ 10–11.

[5] Second Am. Compl. [Doc. No. 112] *passim*.

[6] Second Am. Compl. [Doc. No. 112] ¶¶ 5, 9–10.

[7] Second Am. Compl. [Doc. No. 112] ¶¶ 7–8.

[8] Second Am. Compl. [Doc. No. 112] ¶¶ 14–44.

[9] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF pages 2–11.

regularly used a CPAP machine.[10] CPAP machines are not kept in stock at the MCCF, but "can be ordered for use by a doctor, physician assistant, or nurse practitioner."[11] Hoch asked Plaintiff if a family member or friend would be able to deliver Plaintiff's personal CPAP machine to the MCCF if necessary, and Plaintiff confirmed that they could.[12] Hoch, who has no authority to prescribe or order a CPAP machine, documented Plaintiff's statements.[13]

Plaintiff was referred for further evaluation related to his request for a CPAP machine, and was seen by Certified Registered Nurse Practitioner Kenya Lindsay less than twenty-four hours later on February 28, 2017.[14] NP Lindsay documented that Plaintiff's breathing was "unlabored" and that he showed no signs of "resp[iratory] distress" at that visit. However, NP Lindsay also noted that Plaintiff uses a CPAP machine "every night," is under the treatment of a sleep specialist, Dr. Freidenheim, and that Plaintiff "asked to be assessed to bring in [a] CPAP machine."[15] Although NP Lindsay documented that Plaintiff told her that "his sleep apnea is characterized as mild," Plaintiff disputes this characterization and alleges that he never described his condition as "mild."[16]

Following this visit NP Lindsay consulted with her colleague, Dr. Sestitio, who informed her about procedures for authorizing delivery of CPAP machines to the MCCF. NP Lindsay

---

[10] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF page 4.

[11] Primecare Defs.' Mot. Summ. J. Ex. B [Doc. No. 132-3] ¶ 8.

[12] Second Am. Compl. [Doc. No. 112] ¶ 90.

[13] Primecare Defs.' Mot. Summ. J. Ex. B [Doc. No. 132-3] ¶ 14.

[14] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF page 27.

[15] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF page 25.

[16] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF page 25; Pl.'s Resp. Primecare Defs.' Mot. Summ. J. Counter-Affidavit [Doc. No. 139-5] ¶ 4.

formulated a plan of care, in which she noted that she would need Plaintiff to sign a "Release of Information" ("ROI") to obtain treatment records from Dr. Freidenheim. NP Lindsay also noted that she would need to inform Plaintiff about the protocols surrounding delivery of Plaintiff's personal CPAP machine.[17] NP Lindsay scheduled an appointment for the next day, March 1, to obtain this ROI.[18] However, less than an hour after the appointment with NP Lindsay, Plaintiff was released from the MCCF after posting bail.[19] The March 1 appointment was cancelled due to Plaintiff's release.[20]

### B.  Plaintiff's Second Incarceration (March 2 to March 11)

Plaintiff was rearrested two days later, on March 2, 2017, after a confrontation with police officers outside the home of his residential tenant.[21] Plaintiff alleges that on the first night of his second detention, "in the early hours of March 3" he notified an unidentified correctional officer of his sleep apnea and requested a CPAP machine. The officer told Plaintiff that this could not be addressed at night because of a lack of staff but that he would submit Plaintiff's request.[22] On March 3, 2017, a Primecare employee, Medical Assistant Niambi Mays, performed a second "receiving screening," at which Plaintiff again raised his need for a CPAP machine.[23]

---

[17] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF pages 25–26.

[18] Pl.'s Response Opp'n Mot. Summ. J. Ex. A [Doc. No. 139-3] at ECF pages 13–14.

[19] Pl.'s Resp. Primecare Defs.' Mot. Summ. J. Counter-Affidavit [Doc. No. 139-5] ¶ 2.

[20] Pl.'s Response Opp'n Mot. Summ. J. Ex. A [Doc. No. 139-3] at ECF page 14.

[21] Second Am. Compl. [Doc. No. 112] ¶¶ 45–65.

[22] Second Am. Compl. [Doc. No. 112] ¶¶ 69–76.

[23] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF page 14.

During that screening Plaintiff signed an ROI to allow Primecare to request records from Dr. Freidenheim. This request was forwarded to Dr. Freidenheim on that same day.[24]

Over the next four days, Plaintiff alleges that he twice told correctional officers about his condition. First, Plaintiff alleges that on the morning of March 5 he told Defendant VanDorick that he needed access to a CPAP machine, to which VanDorick allegedly replied "Dude, I don't even care" and indicated that he was unable to help with Plaintiff's request.[25] No evidence suggests that Defendant VanDorick took any steps in response to Plaintiff's complaint.

On March 7, 2017, Defendant Stein allegedly noted that Plaintiff was snoring loudly. Plaintiff explained that he suffered from sleep apnea, was disturbing the other inmates at night, and that he "ha[d] trouble breathing" without a CPAP machine. Plaintiff allegedly requested Stein's help in getting a CPAP machine. In response, Stein purportedly asked Plaintiff if he had told the nurse about his condition, and Plaintiff confirmed that he had.[26] No evidence suggests that Defendant Stein took any further steps in response to Plaintiff's complaint.

Plaintiff's medical records were received on March 6, 2017.[27] On March 7, the day after these records were received, Plaintiff was evaluated by Certified Registered Nurse Practitioner Christina Kline.[28] NP Kline conducted a physical exam, and documented that Plaintiff had "slight expiratory wheezing" and "good air entry throughout."[29] NP Kline noted that Plaintiff

---

[24] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF page 28; Pl.'s Resp. Primecare Defs.' Mot. Summ. J. Counter-Affidavit [Doc. No. 139-5] ¶¶ 13–17.

[25] Second Am. Compl. [Doc. No. 112] ¶¶ 129–136.

[26] Second Am. Compl. [Doc. No. 112] ¶¶ 148–156.

[27] Primecare Defs.' Mot. Summ. J. Ex. A [Doc. No. 132-2] ¶ 33.

[28] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF pages 24–25.

[29] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF page 24.

reported "no acute distress" related to sleep apnea and reported no symptoms while sleeping.[30] Plaintiff disputes this record of his conversation with NP Kline, and avers that he clearly reported sleep disturbances and interrupted breathing at night.[31] NP Kline also instructed Plaintiff to fill out a "sick call form" if he had any worsening symptoms.[32] Although NP Kline had the authority to order a CPAP machine for Plaintiff, she chose not to order one on March 7.[33] A CPAP machine would have been provided had NP Kline ordered one.[34]

On March 9, NP Kline scheduled an appointment with Plaintiff for March 15, 2017, to follow up on Plaintiff's sleep apnea complaint and confirm whether Plaintiff had a contact who could deliver his CPAP machine to the MCCF.[35] This appointment was set for the highest priority.[36] If Plaintiff could have his CPAP machine delivered, NP Kline noted that she would complete the "Doctor's Orders to Jailor" to have the machine cleared by the MCCF's security.[37]

---

[30] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF page 25.

[31] Pl.'s Resp. Primecare Defs.' Mot. Summ. J. Counter-Affidavit [Doc. No. 139-5] ¶¶ 12, 18–27.

[32] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF page 25.

[33] Primecare Defs.' Mot. Summ. J. Ex. A [Doc. No. 132-2] ¶ 38; Primecare Defs.' Mot. Summ. J. Ex. B [Doc. No. 132-3] ¶ 8.

[34] Primecare Defs.' Mot. Summ. J. Ex. A [Doc. No. 132-2] ¶¶ 37–38, 41.

[35] County Defs.' Mot. Summ. J. Ex. K [Doc. No. 133-12] at ECF page 2. The Court notes that the County Defendants conflate the March 7 appointment with NP Kline's follow-up activities on March 9. *See* County Defs.' Mem. L. Supp. Mot. Summ. J. [Doc. No. 133] at 6. The medical records show that Plaintiff was first evaluated by NP Kline on March 7, 2017, and then two days later on March 9 she scheduled a follow-up appointment for March 15. *See* Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF pages 24–25 (documenting March 7 sick call in which NP Kline evaluated Plaintiff's respiratory status); County Defs.' Mot. Summ. J. Ex. K [Doc. No. 133-12] at ECF page 2 (documenting the March 9 creation of a March 15 appointment by NP Kline).

[36] County Defs.' Mot. Summ. J. Ex. K [Doc. No. 133-12] at ECF page 2 (noting that the appointment was "Priority 1" on a scale of 1-5 where 1 is "high" and 5 is "low").

[37] County Defs.' Mot. Summ. J. Ex. K [Doc. No. 133-12] at ECF page 2.

On March 11 Plaintiff was again released from the MCCF after posting bail,[38] and the follow-up appointment was cancelled.[39]

Throughout both periods of incarceration, Plaintiff was assigned to "Q Pod," an intake unit where inmates reside while they are evaluated for a housing classification.[40] Each inmate in Q Pod is actively assessed by the medical department as a matter of policy and practice.[41] Throughout his second period of incarceration, Plaintiff received regular medical care and observation for other medical issues unrelated to his sleep apnea. Specifically, based upon the history of alcohol use that Mr. Yoast provided in the March 3 screening, he was placed on a detox watch.[42] In total, between the period of March 3 and March 10, Plaintiff was seen on seven different occasions by medical personnel.[43]

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a party moving for summary judgment bears the initial burden of informing a court of the basis for the motion and identifying those portions of the record that the movant "believes demonstrate the absence of a genuine issue of material fact."[44] The non-moving party must show that facts are genuinely disputed by either "citing to particular parts of materials in the record," or "showing that the materials cited [by the moving party] do not establish the absence . . . of a genuine dispute, or that an adverse party cannot

---

[38] Second Am. Compl. [Doc. No. 112] ¶ 65.

[39] County Defs.' Mot. Summ. J. Ex. K [Doc. No. 133-12] at ECF page 2.

[40] Second Am. Compl. [Doc. No. 112] ¶ 69; County Defs.' Mot. Summ. J. Ex. B [Doc. No. 133-3] at 3.

[41] County Defs.' Mot. Summ. J. Ex. D [Doc. No. 133-5] at ECF pages 5–6.

[42] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF page 22.

[43] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF page 22.

[44] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

produce admissible evidence to support the fact."[45] "In attempting to defeat summary judgment, speculation and conclusory allegations do not satisfy the nonmoving party's duty."[46]

However, even if the non-moving party does not contest a particular fact, "a 'district court may not rely solely on the [movant's] statement of undisputed facts,"[47] but "must be satisfied that the citation to evidence in the record supports the assertion."[48] Summary judgment is only proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[49] In evaluating a motion for summary judgment, the Court must "draw all reasonable inferences from the record in favor of the non-moving party."[50] Where a party is representing himself *pro se*, the filings are to be construed liberally. "Thus, if the Court can reasonably read Plaintiff's pleadings together with his summary judgment submissions to show an entitlement to relief, the Court should do so despite any failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or the litigant's unfamiliarity with pleading requirements."[51]

---

[45] Fed. R. Civ. P. 56(c)(1).

[46] *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020), *amended*, 979 F.3d 192 (3d Cir. 2020) (quotations omitted).

[47] *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006), *amended* (3d. Cir. 2006) (quoting *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)).

[48] *Vermont Teddy Bear Co.*, 373 F.3d at 244 (citation omitted).

[49] Fed. R. Civ. P. 56(c).

[50] *Scott v. Calpin*, 527 F. App'x 123, 124 (3d Cir. 2013).

[51] *Whitenight v. Elbel*, No. 2:16-CV-00646, 2019 WL 6828653, at *2 (W.D. Pa. Dec. 13, 2019).

## III.  DISCUSSION

As a pretrial detainee, Plaintiff's claims for inadequate medical care are "adjudicated under the Due Process Clause of the Fourteenth Amendment," rather than under the Eighth Amendment.[52] The Third Circuit has recognized that "pretrial detainees are entitled to at least as much protection as convicted prisoners and that decisions interpreting the Eighth Amendment serve as useful analogies" for analyzing suits alleging that a pretrial detainee received inadequate medical care.[53] To establish an Eighth Amendment claim for inadequate medical care under 42 U.S.C. § 1983, "a plaintiff must make (1) a subjective showing that "the defendants were deliberately indifferent to [his or her] medical needs" and (2) an objective showing that "those needs were serious."[54] "While the deliberate indifference test is not dispositive in analyzing the claims of pretrial detainees, it [is] still . . . instructive as a guide."[55]

### A.  Defendants Ryan VanDorick, Timothy Stein, and Anthony Hoch

The Second Amended Complaint brings § 1983 claims against Defendants VanDorick, Stein, and Hoch in their individual capacities for "failure to render medical aid."[56] Plaintiff's responses in opposition to the motions for summary judgment indicate that he does not contest summary judgment with respect to Defendants VanDorick, Stein, and Hoch.[57]

---

[52] *Edwards v. Northampton Cnty.*, 663 F. App'x 132, 136 (3d Cir. 2016).

[53] *Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir. 1987) (quotations omitted).

[54] *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017).

[55] *Warren v. PrimeCare Med. Inc.*, No. 16-CV-0643, 2017 WL 11508219, at *3 (E.D. Pa. Feb. 2, 2017).

[56] *See* Second Am. Compl. [Doc. No. 112] at Count II, Count IV, Count V.

[57] *See* Pl.'s Resp. County Defs.' Mot. Summ. J. [Doc. No. 140-2] at 1 n.1; Pl.'s Resp. Primecare Defs.' Mot. Summ. J. [Doc. No. 139-2] at 1 n.1.

In addition to Plaintiff's concession, the record establishes that there is no basis to hold these Defendants liable under § 1983. Hoch evaluated Plaintiff on intake to the MCCF, documented Plaintiff's use of a CPAP machine, and transmitted that information to a nurse practitioner who saw Plaintiff the next day. Hoch had no authority to prescribe or order a CPAP machine. Although there is no evidence that VanDorick or Stein acted in response to Plaintiff's request for a CPAP machine, at all relevant times Plaintiff was assigned to "Q Pod," an intake housing unit where patients were regularly evaluated by medical professionals. "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."[58] "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official" cannot be held deliberately indifferent.[59] As VanDorick and Stein both knew that Plaintiff was being medically evaluated, and Plaintiff explicitly told Stein that Plaintiff had reported his sleep apnea to the medical staff, summary judgment is appropriate.[60]

Defendants argue that, as Plaintiff has "abandoned his § 1983 claims" against VanDorick, Stein, and Hoch, he can no longer maintain a *Monell* claim against Primecare and Montgomery

---

[58] *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).

[59] *Id.*

[60] The Second Amended Complaint also brings a claim against VanDorick for intentional infliction of emotional distress. Pennsylvania law provides that a person may be held liable where, "by extreme and outrageous conduct" that person "intentionally or recklessly causes severe emotional distress to another." *Hoy v. Angelone*, 720 A.2d 745, 753 (Pa. 1998) (quotation omitted). "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id*.

Accepting Plaintiff's version of his conversation with VanDorick as true, VanDorick gave a condescending and flippant response to Plaintiff's medical complaints. However, while inappropriate and unprofessional, such comments are not sufficiently extreme as to meet Pennsylvania's standard for intentional infliction of emotional distress.

County.[61] This misunderstands the basis for policymaker liability under *Monell* and § 1983. The Supreme Court and the Third Circuit have repeatedly emphasized that municipal policymaker liability under *Monell* is tied to the policymaker's own individual action or inaction, and is not derivative of the liability of particular subordinates.[62] Defendants overread *Mills v. City of Harrisburg* and *City of Los Angeles v. Heller*, each of which emphasizes a simple rule: actions brought under § 1983 are in essence torts, and Plaintiff must show damages—that is, an actual "deprivation of . . . rights, privileges, or immunities secured by the Constitution and laws."[63]

Here, Plaintiff has never abandoned his claim that he suffered a constitutional injury. Yoast's admission that specific officers did not, as individuals, engage in actions that amounted to deliberate indifference to his federal rights is not an admission that municipal policymakers were not deliberately indifferent to his rights. This is especially true in cases like this one, where a plaintiff alleges harm caused by delayed medical care. Where a plaintiff alleges that the aggregate inaction of a government entity caused an injury, the policymaker whose policies

---

[61] County Defs.' Reply [Doc. No. 141] at 2–3; Primecare Defs.' Reply [Doc. No. 142] at 5.

[62] *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir. 2003) ("Because the jury in this case found no constitutional violation, *Heller* precludes a finding of municipal liability against the City. This conclusion follows naturally from the principle that municipal liability will only lie where municipal action actually caused an injury."); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[N]either *Monell v. New York City Dept. of Social Services* nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."); *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

[63] 42 U.S.C. § 1983; *see Heller*, 475 U.S. at 799 (emphasizing that "this was an action for damages," and that "the award of damages" is not authorized when a jury has concluded that "no constitutional harm" was inflicted); *Mills v. City of Harrisburg*, 350 F. App'x 770, 773 n.2 (3d Cir. 2009) (emphasizing that dismissal was appropriate because the plaintiff "suffered no violation of his constitutional rights" and that a § 1983 claim cannot be sustained where there is no alleged constitutional harm); *Stephens v. City of Englewood*, 689 F. App'x 710, 714 (3d Cir. 2017) (affirming dismissal because plaintiffs failed to establish *any* "underlying constitutional violation, [and so their] claims against the [municipal actors] also necessarily fail").

caused such inaction may be deliberately indifferent even if no individual subordinate's inaction amounts to deliberate indifference.[64]

### B.  Defendant PrimeCare Medical, Inc.

Count III of the Second Amended Complaint alleges that Primecare has established customs or policies that are deliberately indifferent to the serious medical needs of prisoners suffering from sleep apnea.[65] Specifically, Plaintiff argues that Primecare's existing policies surrounding the treatment of patients with sleep apnea "lack[] a sense of urgency," and that these procedures resulted in an unconstitutional delay of Plaintiff's access to his CPAP machine.[66] The Court will assume for purposes of summary judgment that Plaintiff can show that he had a serious medical need. Primecare argues that Plaintiff has not demonstrated any evidence of a policy or custom that delayed Plaintiff's treatment.[67]

To support a § 1983 claim against Primecare, "a private corporation providing medical services under contract with a state prison system, a plaintiff must be able to show 'a policy or custom that resulted in the alleged constitutional violations.'"[68] Plaintiff argues that Primecare "fail[ed] to adopt a policy to address the immediate and exigent medical needs of inmates or

---

[64] *See Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994) (holding that "in a substantive due process case arising out of a police pursuit, an underlying constitutional tort can still exist even if no individual police officer violated the Constitution"). "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990).

[65] Second Am. Compl. [Doc. No. 112] ¶ 107.

[66] Pl.'s Resp. Primecare Defs.' Mot. Summ. J. [Doc. No. 139-2] at 10.

[67] Primecare Defs.' Mem. L. Supp. Mot. Summ. J.  [Doc. No. 131-1] at 13.

[68] *Alexander v. Monroe Cnty.*, 734 F. App'x 801, 805 (3d Cir. 2018) (quoting *Palakovic v. Wetzel*, 854 F.3d 209 (3d. Cir. 2017)) (emphasis omitted).

pretrial detainees that suffer from sleep apnea."[69] Plaintiff contends that "Primecare's existing practice is unconstitutional to the extent it allows their medical professionals to supersede the diagnostics of other independent medical providers who have previously prescribed CPAP machines for incoming detainees or inmates, by supplanting that diagnosis with their own medical judgment."[70] Plaintiff argues that the nine consecutive nights that Plaintiff was in the MCCF without access to a CPAP machine represents the "[d]iscontinuance of a medical treatment that was previously prescribed."[71] In addition, Plaintiff alleges that the delay between his screening and treatment and the repeated consultations with RN Kline created "a very slow sail through the bureaucratic channels of . . . PrimeCare's internal network while their health care professionals ping-pong remarks and convey notes."[72] He attributes this delay, in part, to a policy that "only PrimeCare's Dr. Sestit[i]o was authorized to approve the delivery of Plaintiff's personal CPAP machine and the inferior employees had to rely on his superintendence."[73]

Although policies that establish an unnecessarily byzantine medical evaluation process could constitute deliberate indifference to urgent medical needs, Plaintiff fails to support his claim that any policy or customary process actually resulted in an unconstitutional delay of his treatment. "A claim alleging the delay or denial of medical treatment requires inquiry into the subjective state of mind of the defendant and the reasons for the delay, which like other forms of

---

[69] Pl.'s Resp. Primecare Defs.' Mot. Summ. J. [Doc. No. 139-2] at 5.

[70] Pl.'s Resp. Primecare Defs.' Mot. Summ. J. [Doc. No. 139-2] at 6–7.

[71] Pl.'s Resp. Primecare Defs.' Mot. Summ. J. [Doc. No. 139-2] at 3.

[72] Pl.'s Resp. Primecare Defs.' Mot. Summ. J. [Doc. No. 139-2] at 13.

[73] Pl.'s Resp. Primecare Defs.' Mot. Summ. J. [Doc. No. 139-2] at 13.

scienter can be proven through circumstantial evidence and witness testimony."[74] Here, Plaintiff has not provided any evidence that policies or procedures, rather than the medical decisions of qualified practitioners, actually delayed his care.

Plaintiff bears an initial burden of proving that any delay in his care was the result of deliberate indifference to his medical needs rather than the medical judgment of NP Lindsay and NP Kline.[75] To make out a claim for denial or delay of medical care, "governmental actors' intent must be greater than mere negligence for their alleged misconduct to support a constitutional claim."[76] However, Plaintiff presents no evidence that his care was, in fact, substantially delayed by Primecare's employees.

The timeline in this case is undisputed. Plaintiff saw NP Lindsay on the day after his first arrest, where NP Lindsay evaluated Plaintiff's breathing and formed a plan of care that included reviewing medical records kept by Plaintiff's private physician. Although this plan was interrupted by Plaintiff's first release, when Plaintiff was rearrested the plan was reinitiated and Plaintiff's sleep apnea records were requested. NP Kline saw Plaintiff regarding his sleep apnea on March 7, the day after his treatment records were provided by his physician. At the March 7 visit, after receiving Plaintiff's medical records and evaluating Plaintiff's breathing, NP Kline instructed Plaintiff to report any worsening symptoms but declined to order a CPAP machine. However, NP Kline remained attentive to Plaintiff's condition, and on March 9 NP Kline

---

[74] *Savage v. Wexford Health Sources, Inc.*, No. CV 16-2923, 2017 WL 5593353, at *5 (E.D. Pa. Nov. 21, 2017).

[75] *Id.*

[76] *Montgomery v. Aparatis Dist. Co.*, 607 F. App'x 184, 187 (3d Cir. 2015).

scheduled a follow-up appointment for March 15 to further discuss Plaintiff's sleep apnea. Plaintiff was released before this appointment.

Plaintiff argues that the nine-day failure to provide a CPAP machine during Plaintiff's second incarceration was due to administrative uncertainty rather than the medical judgment of NP Kline and NP Lindsay, and constitutes an unconstitutional delay. Plaintiff points to an affidavit from Primecare's CEO, Thomas J. Weber, which states that "[t]here is no specific policy for the provision of CPAP machines to inmates at the [MCCF]."[77] In addition, Plaintiff argues that Primecare requires requests for CPAP machines to be routed through Dr. Sestitio, unnecessarily delaying access. However, Plaintiff provides no basis for this assertion, and there is no evidence that any non-medical considerations by NP Lindsay and NP Kline delayed Plaintiff's treatment. In fact, the same affidavit that denies a specific policy related to CPAP machines shows that that NP Lindsay and NP Kline are both independently authorized to order a CPAP machine for prisoner use, even in the absence of a formal "sleep apnea policy."[78] The record before this Court on summary judgment contains only one reference to Dr. Sestitio—while formulating a plan of care, NP Lindsay consulted Dr. Sestitio about procedures surrounding approval of an external CPAP machine.[79] The fact that NP Lindsay consulted with her colleague about Plaintiff's sleep apnea is not evidence that Dr. Sestitio's approval was required to secure a CPAP machine; it is only evidence that NP Lindsay carefully considered Plaintiff's course of treatment. Although Plaintiff asserts that "Dr. Sestit[i]o entered an approval

---

[77] Primecare Defs.' Mot. Summ. J. Ex. A [Doc. No. 132-2] ¶ 5.

[78] Primecare Defs.' Mot. Summ. J. Ex. A [Doc. No. 132-2] ¶ 7.

[79] Primecare Defs.' Mot. Summ. J. Ex. D [Doc. No. 132-5] at ECF pages 25–26.

in the network on March 9th, 2017," for Plaintiff's March 15 follow-up appointment, the record cited by Plaintiff does not mention Dr. Sestitio or any other doctor. The record shows that NP Kline created the March 15 appointment.[80] The record contains no evidence that Dr. Sestitio was at all involved in Plaintiff's treatment during his second incarceration, or that requests for CPAP machines needed to be routed through a single person. Moreover, even if Dr. Sestito's approval were required, Plaintiff has not shown that this could cause a delay serious enough to amount to deliberate indifference.

It is unfortunate that Plaintiff does not feel as though he had adequate medical care at the MCCF, and the Court is conscious of Plaintiff's assertion that he suffered anxiety and severe discomfort that he attributes to his lack of a CPAP machine. However, the record in this case shows that during the two separate weeks that Plaintiff was incarcerated, he was repeatedly assessed for issues related to his sleep apnea and repeatedly evaluated for the possibility of receiving a CPAP machine. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."[81]

Plaintiff's disagreement with NP Lindsay and NP Kline "as to the proper course of his treatment does not indicate that it was unconstitutionally delayed."[82] When a prisoner is under continuous care by medical professionals for a medical condition, a delay in providing a specific

---

[80] Pl.'s Response Opp'n Mot. Summ. J. Ex. A [Doc. No. 139-3] at ECF pages 6, 14.

[81] *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979).

[82] *Montgomery v. Aparatis Dist. Co.*, 607 F. App'x 184, 188 (3d Cir. 2015).

course of treatment does not present "a sufficient basis for establishing a triable issue of deliberate indifference."[83]

### C.  Defendant Montgomery County, PA

Counts VI and VII of the Second Amended Complaint allege that Montgomery County has established customs or policies that are deliberately indifferent to the serious medical needs of prisoners suffering from sleep apnea and failed to adequately train MCCF employees surrounding the treatment of prisoners with sleep apnea.[84] However, actions brought under § 1983 require Plaintiff to show an actual "deprivation of . . . rights, privileges, or immunities secured by the Constitution and laws."[85] As noted above, the record on summary judgment does not show any triable allegations that Plaintiff suffered an unconstitutional delay in medical treatment. "Failure to train" and "policy or custom" claims cannot be sustained where there is no underlying constitutional injury,[86] and summary judgment on these claims against Montgomery County is appropriate.

---

[83] *Bickel v. Miller*, 446 F. App'x 409, 413 (3d Cir. 2011) (affirming summary judgment against a prisoner who alleged that he was not given pain medication for seven days after a transfer where prisoner was under continuous medical care, and did not provide evidence that a delay in treatment harmed him); *see also Beard v. Corizon Health, Inc.*, No. CV 14-4129, 2017 WL 368037, at *4 (E.D. Pa. Jan. 24, 2017) ("Although defendant Frias's delay of one month in scheduling plaintiff's [surgical] follow-up visit is not exemplary, it does not amount to deliberate indifference to a serious need for medical care" even where the follow-up visit was recommended by the plaintiff's surgeon); *Parker v. Butler Cnty.*, 832 F. App'x 777, 780–81 (3d Cir. 2020) (holding that even though a prisoner did not see a doctor who was capable of prescribing a treatment until nineteen days after that treatment was discontinued, this delay did not demonstrate deliberate indifference of prison medical staff who were actively monitoring and responding to the plaintiff's medical condition).

[84] Second Am. Compl. [Doc. No. 112] ¶¶ 168–205.

[85] 42 U.S.C. § 1983.

[86] *See Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir. 2003); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

**IV.   CONCLUSION**

Plaintiff claims that Defendants unconstitutionally delayed his access to a CPAP machine during his brief stints as a pretrial detainee. However, Plaintiff was continuously under the medical care of practitioners authorized to prescribe a CPAP machine and there is no evidence that their decisions were motivated by non-medical considerations. Defendants' motions for summary judgment will be granted. An order will be entered.